IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| CINDA LOUISE GUSTIN,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | No. C10-4014-PAZ<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

*Introduction*

This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's applications for Disability Insurance benefits ("DI") under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and Supplemental Security Income ("SSI") under Title XVI of the Act. The plaintiff Cinda Louise Gustin claims the ALJ failed to accord appropriate weight to the opinions of her treating physician, and failed to evaluate her credibility properly.

Gustin filed her application for DI benefits on January 25, 2007. She filed her application for SSI benefits on November 4, 2008. In both applications, she alleged a disability onset date of May 7, 1995. She later amended her alleged onset date to January 31, 2007, the date she closed her flea market business. Her claims were denied initially and on reconsideration. She filed a request for hearing, and a hearing was held on April 22, 2009, before an ALJ. Gustin was represented by an attorney at the hearing. Gustin and a vocational expert ("VE") testified. On July 13, 2009, the ALJ issued her decision, finding that although Gustin has severe impairments consisting of fibromyalgia and chronic obstructive pulmonary disease (COPD), her impairments do not reach the Listing level of severity. The ALJ found Gustin retains the residual functional capacity

to perform her past relevant work as a sales attendant, flea market worker, and night auditor/gambling cashier, and Gustin therefore is not disabled.

Gustin filed a timely Complaint in this court, seeking judicial review of the ALJ's decision. On March 12, 2010, with the parties' consent, Judge Donald E. O'Brien transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The court first will summarize the testimony at the ALJ hearing, and the other evidence in the Record.

*Hearing Testimony*

Gustin claims she is disabled due to fibromyalgia and persistent headaches that cause her significant pain and muscle spasms. At the time of the ALJ hearing, she was 52 years old, married, and living in Onawa, Iowa. She has completed one year of community college where she studied clerical bookkeeping, earning C's and D's in her classes. She considers herself to be of lower intelligence, and she stated her ability to concentrate and understand things has diminished since the onset of her fibromyalgia.

Gustin's husband is disabled due to a seizure disorder that causes him to have seizures almost daily. Gustin's son and daughter-in-law, ages 32 and 34 respectively, live with Gustin and her husband, and help them with housework and yard work. Her son is

a bricklayer and her daughter-in-law is a registered nurse. Two children, ages 6 and 10, also live in the household.

Gustin's work history began at age 14, when she began working at a Dairy Queen as a seasonal job. She cooked, waited on customers, and eventually supervised other employees. She worked at Dairy Queen during the summers, and found other jobs during the winter months. She has worked as a cashier and stocker at a Dollar General Store; as a checker/cashier at a truck stop; as a waitress at a café; at a deli, making food; as a night auditor at a casino, for the Winnebago Tribe; and as a secretary briefly after she completed her bookkeeping courses, some fifteen years ago. She stopped working at these types of jobs when she began having fibromyalgia symptoms. She had pain in her legs and arms, and these types of jobs required her to spend too much time on her feet.

In 2005, Gustin and her husband bought a building and opened a flea market. They managed the building and rented out booth spaces. They also sold various items themselves. In the beginning, Gustin worked at the flea market from 8:00 a.m. to 4:00 p.m., six days a week. As her condition worsened, she gradually cut her hours, first going to five days a week, then opening at 10:00 a.m. instead of 8:00 a.m., then being open from 10:00 a.m. to 2:00 p.m., and then closing some days during the week. She eventually closed the business because she never knew when she would feel well enough to work. According to Gustin, her booth renters "were all very understanding" because they had "seen [her] pain." She believes she is unable to return to any of her past work because all of the jobs required her "to stand for brief periods. Sit for brief periods." She has difficulty standing for very long. She also has difficulty managing money, and no longer trusts herself to perform most mental tasks, including managing her own medications.

Gustin filed her application for disability benefits within about a week of the time she closed the flea market. According to Gustin, her doctor, John A. Hurley, M.D., told

3

her she "wasn't going to be able to do anything for a long time," and her condition would continue to get worse. Gustin stated she has been diagnosed with fibromyalgia and Sjögren's syndrome, a condition that causes dry mouth and eyes and joint pain. To her knowledge, there is no treatment for Sjögren's syndrome.

Gustin smokes about a pack of cigarettes a day, and smoking bothers her breathing. She stated no doctor has ever advised her to stop smoking - an assertion disbelieved by the ALJ. *See* R. 15 (When Gustin testified her doctor never told her she should not smoke, the ALJ exclaimed, "Oh, you're kidding me.").

For her fibromyalgia symptoms, Gustin stated she has taken Atarax, an antihistimine, twice a day; Tramadol for pain; and Zanaflex, a muscle relaxant, to help her sleep at night. She stated the Zanaflex "is just horrid, because it gives you a big hangover in the morning." The Tramadol made her nauseous and sleepy and gives her diarrhea, so she seldom takes it, stating she would rather have pain than the side effects of pain medication. She indicated her fibromyalgia symptoms are worsening over time. She used to see Dr. Hurley every six months, but her visits have been increased to every three months. Stress makes her pain much worse, and her doctor has advised her to minimize her stress.

Gustin stated she has pain in her legs, low back, shoulders, legs, feet, hips (particularly on the right), and hands. Her hands cramps up, and her feet "roll up" with cramps. She also gets cramps in her calves. Her pain is worse in the evening and at night. She stated she wakes up with leg cramps, and her neighbors have asked why she screams at night. She cannot sit for more than an hour before she has to get up and move around. After ten to fifteen minutes, she is able to sit down again. She usually has to lie down for twenty to thirty minutes during the day. If she uses her hands for writing, stirring food, or the like, they cramp up and she cannot move them until the cramping stops. Gustin estimated she can lift and carry a gallon of milk using both hands. She can reach forward

with her arms in front of her as long as she does not "over do it continuously." If she reaches up above her head, for example to screw in a lightbulb, she sometimes passes out. She stated she has been "on the floor more than once" from passing out.

Gustin tries to maintain what she termed a "normal" routine. She gets up and eats breakfast, takes her medications, and then tries to do some housework. She stated she has to do her laundry slowly and in intervals, and she seldom feels able to vacuum. She is unable to mow the lawn or shovel snow. She does drive from time to time, but she always has another driver with her. She spends time with her dog, and in the summertime, she likes to go fishing, although she cannot sit and fish for very long, and she no longer is able to "throw a cast" with her fishing pole. She tries to get some exercise by walking, and by moving her legs and arms. According to Gustin, her doctor has advised her to walk the length of the house four times a day, and she tries to do that each day. She used to enjoy bowling and other activities that she has had to stop due to her symptoms.

### *Summary of Gustin's medical history*

In July 2006, Gustin suffered from diarrhea and difficulty swallowing solid food (dysphagia). Biopsies of her colon and small bowel were normal. Her esophagus was dilated, and this apparently resolved the problems, because she no longer complained of these symptoms when she was seen for evaluation by John A. Hurley, M.D. in December 2006. Dr. Hurley indicated Gustin had been diagnosed with cutaneous lupus in 1996, that had been relatively stable since then. Gustin complained to Dr. Hurley about a six to eight-month history of "significant problems of spasms in her hands and feet, intermittent hoarseness, dizziness, fatigue and a poor sleeping pattern at night." R. 229. She stated treatment with various muscle relaxers in the past had not helped her to any degree.

Upon examination, Gustin had full ranges of motion in her upper and lower extremities. She exhibited tenderness at "multiple trigger points." R. 230. Her

5

laboratory tests showed "a positive ANA with SSA and SSB antibodies." *Id.* Dr. Hurley concluded that Gustin likely had "a condition such as fibromyalgia." He noted she had a history of discoid lupus, but he did not believe it to be the systemic form. He further doubted she had Sjögren's syndrome. He prescribed Flexeril ( a muscle relaxant) 5 mg at nighttime, and Lodine (a nonsteroidal anti-inflammatory drug) 400 mg twice daily. He directed her to return for follow-up in about one month.

On November 9, 2006, Gustin saw a doctor with complaints of "difficulties with severe back pain going down into her buttocks, then going down her legs, especially her left leg, sometimes going down into her left groin." R. 261. Gustin also indicated she was "quite worried" due to her "history of skin lupus," and she was having difficulty with severe cramping in her hands and feet. The doctor prescribed Skelaxin 800 mg, three to four times daily, and Ibuprofen 800 mg, three times daily. He also advised her to use heat on the affected areas as often as possible, and he ordered laboratory tests. He suggested she see a chiropractor, but Gustin declined the referral due to having no insurance. R. 261.

Gustin returned to see Dr. Hurley on January 15, 2007. She stated she was "doing somewhat better," but she still had "rather significant pain." R. 280. He prescribed Tramadol in addition to the Lodine and Flexeril. *Id.*

On February 6, 2007, Gustin saw a doctor to discuss Dr. Hurley's recent diagnosis of fibromyalgia. The doctor noted the following history:

> [The fibromyalgia] has caused her a significant amount of difficulties. She has gradually had to decrease the amount of work she was doing and now has completely stopped working. She's having so much cramping in her hands, side and feet. She can't be on her feet for very long. Her hands cramp so bad that she has difficulty doing any activities with her hands. She says she's just having a great amount of difficulty. She feels that since she's been placed on Flexeril and Lodine that she's been feeling real tired during the day, even feels groggy,

6

> even though she's only taking the Flexeril at night. She felt she was having this drowsiness prior to being started on the Tramadol which was the last medicine she was started on. She feels she's had some improvement in her discomfort but is still having quite a bit of problems. She is hoarse today in the office. She can barely talk to me. She says this has been going on for quite some time. She says it's been 3 weeks since she's had any type of voice. She has smoked for about 25 years.

R. 260. The doctor recommended discontinuing the Flexeril. He recommended she see an ENT for her hoarseness, but Gustin declined, stating she had no insurance.

Gustin saw Dr. Hurley for follow-up on February 12, 2007. She was sleeping better but had the experience of feeling "hung over" in the morning. He directed her to take her Flexeril earlier in the evening so the "hung over" feeling could wear off before she awoke in the morning. R. 279.

In early March 2007, Douglas W. Martin, M.D. performed a comprehensive consultative examination of Gustin at the request of the state agency. He listed Gustin's chief complaints as "[b]reathing trouble, foot pain, arthritis and fibromyalgia." R. 238. Dr. Martin found Gustin to have multiple tender points; however, he found Gustin technically had fewer than "the positive 11 out of 18 tender points, according to the American College of Rheumatology criteria for fibromyalgia syndrome." R. 240. He noted that Gustin had had a single positive ANA test, the etiology of which was "unclear." *Id*. He therefore was unable to verify the diagnosis of fibromyalgia based on his examination. Instead, he opined Gustin "probably has some mild myofascial pain syndrome symptoms of the shoulder and neck musculature," but he was unable to understand the cause of her hand and foot spasms. He also wondered whether Gustin had had "all appropriate medical interventions concerning these problems." R. 241

Dr. Martin opined Gustin would be able to lift and carry about twenty pounds occasionally, ten to fifteen pounds frequently, and three to five pounds constantly; stand

for six to eight hours a day; walk five to six blocks before needing a break; sit without limitation; no prolonged or heavy grasping or gripping; and no environmental limitations. Regarding her ability to stoop, climb, kneel, and crawl, he indicated he "would limit those to about one-half of what would be considered normal." *Id.*

On April 9, 2007, Gustin saw Dr. Hurley with a complaint that she was "doing 'goofy' things," giving examples of leaving the stove on when she left the kitchen, and making her husband a sandwich with meat on the outside and bread on the inside. The doctor opined that Flexeril might be causing Gustin's "somewhat bizarre behavior." He discontinued the Flexeril and added Skelaxin for her cramping. R. 278.

On June 5, 2007, James D. Wilson, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. He opined Gustin would be able to lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk, with normal breaks, for about six hours a day; sit, with normal breaks, for about six hours a day; and push/pull without limitation. He suggested she should avoid concentrated exposure to extreme cold, and to fumes, odors, dusts, gases, and the like, but he found her to have no other work-related limitations. R. 245-52.

On July 16, 2007, Dr. Hurley saw Gustin for follow-up of her fibromyalgia. She stated she still was having difficulty with cramps, especially at night, which interfered with her sleep. She stated this left her very tired during the day, making it difficult for her to perform even simple daily activities. The doctor noted Gustin "remains a difficult therapeutic dilemma." R. 276. He increased her Zanaflex dosage to 4 mg at night to help with the cramps. He also recommended she exercise regularly, but he noted she would be unable to do so until her cramps resolved. *Id.*

Gustin saw a doctor on June 26, 2007, complaining of dizziness for the previous six weeks without nausea or vomiting. The doctor advised her to decrease her caffeine intake, eat small regular meals, and have her eyes checked. R. 344.

On July 20, 2007, Jan Hunter, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. R. 284-91. She opined Gustin would be able to lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk for six hours in a normal work day, sit for up to six hours in the work day, and push/pull without limitation. She indicated Gustin could perform all postural activities occasionally, and she should avoid concentrated exposure to temperature extremes and fumes, odors, dust, and the like. *Id.*

On July 27, 2007, Dr. Hurley completed a Fibromyalgia Physical Capacity Evaluation form supplied by Gustin's attorney. Dr. Hurley indicated he had seen Gustin six times since her first visit in December 2006. He stated Gustin had "[n]o underlying deforming musculoskeletal disease," and her prognosis was "too variable in this condition to predict. Expect this to be chronic in nature." R. 268. He stated his conclusion was based on "tenderness to palpation in soft tissue area diffusely"; normal CBC, sed rate, CPK, metabolic panel, and thyroid function; and abnormal FANA, SSA, and SSB tests. The doctor listed Gustin's symptoms as multiple tender points, chronic fatigue, "Sicca symptoms," and bilateral pain of her entire back, and her shoulders, arms, hips, and legs. He stated she had cramping, and "chronic, daily pain with some interference in performance of daily activities." R. 270. He opined her pain would be precipitated by changing weather, cold, fatigue, and overuse/movement. He indicated Gustin was not a malingerer, although he noted that emotional factors contributed to the severity of her symptoms and functional limitations. R. 269.

Regarding Gustin's likely limitations resulting from her symptoms, Dr. Hurley opined her symptoms often would interfere with her attention and concentration, and she would have a slight limitation in her ability to deal with work stress. He stated she would have side effects from her medications including stomach upset and fatigue. He opined she could walk three city blocks without rest; continuously sit for two hours at a time, for a

9

total of about four hours in a day; continuously stand for thirty minutes at a time, for a total of about two hours in a day. She would need to walk around about five minutes every hour, and she sometimes would have to take unscheduled breaks during the day. She would need the freedom to change positions at will. She could lift ten to twenty pounds occasionally and less than ten pounds frequently, and she never should lift as much as fifty pounds. She would have significant limitations in her ability to do repetitive reaching, handling, and fingering, and she could bend and twist at the waist about 40% of the time during the working day. In the doctor's opinion, Gustin should not work more than six hours, total, in a day, and she could not complete a full work week. In addition, she occasionally would need to work at a slow pace. R. 268-74.

Dr. Hunter apparently was asked to review Dr. Hurley's opinion and provide comments. regarding Dr. Hurley's opinion of Gustin's work-related limitations. Dr. Hunter agreed the lifting and carrying restrictions Dr. Hurley imposed were consistent with Gustin's activities. However, she found "the six hour per day [work] restriction is not supported by the clinical evidence or [Gustin's] reported activities. The claimant states that she drives, shops in stores, cleans, vacuums, and does the laundry." R. 310.

On August 7, 2007, Gustin was seen by Michael P. Baker, Ph.D. for a psychodiagnostic mental status examination, on referral from the state agency. R. 292-95. The referral notes asked the doctor to "comment on depression and memory," noting Gustin was seen as having difficulty with daily activities, such as remembering to take her medications. R. 292. Gustin stated her medications affected her mind, and she felt she needed to see a psychiatrist for depression. The doctor noted the following regarding Gustin's activities of daily living:

> Client lives in Onawa and husband is a truck driver often gone 15 days at a time. She spends most of her days with her mother. She can drive, but prefers only in her small hometown and not on gravel or over bridges. She reports that she can not drive unless she has someone with her. She did

> drive to the session today but added "I drive like an old lady". She will not drive on the interstate and therefore has to take different routes.
>
> Client normally goes to bed about 10:00 PM and has fairly quick onset to sleep, but is often waken [sic] by cramps. Prescription to decrease cramping has been discussed with physician so she gets better sleep. She rises between 7:00 and 8:00. She will have a coffee, shower, and then will feel tired and have to sit for an hour. She often goes to her mother's and they sit, converse, and watch TV. Client may "throw a load of laundry in", but a simple task like that she reports, tires her out. She reports having been very active, for instance going to auctions previously. She reports significant problems with dizziness that went on for some[]time but has improved over the last few weeks. This affected her ability to read, for instance, and her blood pressure was fluctuating. This has improved before physician felt it necessary to refer her to a neurologist.
>
> Client will do other chores around the house such as the dishes. She reports that she does mow their lawn and added "I ride to do it, but I do it in a couple sittings. The heat is hard on me". She does do shopping, but since husband is gone often, it is usually for a few items at a time. Client reports that she has usually done the monthly bills but recently they do this together and he checks over to make sure she hasn't forgotten things, compared to in the past. Client socially is just involved with her mother and they together might go to visit the mother's friends or go to the thrift store. Client does have a license and does drive minimally.

R. 293.

Gustin stated her mood was "dumpy," and she described frequent crying, and spells of feeling lonely and sad. The doctor opined she "likely could benefit from cognitive therapy approaches for phobic problems and general anxiousness." He noted she did not appear to be significantly anxious. He diagnosed her with adjustment disorder with

depressed mood, and specific phobia related to driving situations. He estimated her current Global Assessment of Functioning at 55, indicating moderate symptoms.

Dr. Baker reached the following conclusions regarding Gustin's work-related mental limitations:

> [S]he generally has the intellectual ability it would seem to remember and understand instructions, procedures, and occasions. She reports low energy and physical difficulties that probably will have affect [sic] on pace as well as maintaining adequate concentration and attention for carrying out instructions in a routine employment setting depending on the degree of demands. She interacted quite appropriately and probably can do so in a workplace. Her anxiety levels are significant specifically in how they interfere in regards to driving and that results in restrictions, but could be improved through therapy. She does not give a history indicating poor judgment in responding to changes in the workplace.

R. 294.

On August 20, 2007, Herbert Notch, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. R. 296-309. He evaluated Gustin under Listing 12.04 Affective Disorders, finding her to have an "adjustment disorder depressed type," and Listing 12.06 Anxiety-Related Disorders, related to her "specific driving phobia." He found her impairments not to be severe, and opined they would cause Gustin only mild difficulties in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.

On September 18, 2007, Gustin saw a doctor complaining about an episode when she had a sudden, severe headache coupled with urinary and bowel incontinence. The headache lasted for fifteen to twenty minutes and then resolved. She complained of fatigue, lack of energy, and decreased appetite since the episode. A CT study was negative. The doctor indicated Gustin would be scheduled for a neurology consult.

12

R. 316, 341. She saw a neurologist who suggested an MRA to look for an aneurysm. The MRA was normal.

Gustin saw a doctor on October 4, 2007, complaining of chest congestion and wheezing. She was diagnosed with bronchitis and treated with antibiotics and albuterol. She also received a prescription for Advair. R. 340.

Gustin saw a doctor on June 25, 2008, for follow-up of her fibromyalgia. She was scheduled to see a neurologist in Iowa City. On July 14, 2008, Gustin saw a neurologist for consultation with regard to her headache in September 2007, with urinary and bowel incontinence. Gustin stated she had not had another similar episode, and her dizziness was improving somewhat. However, she stated she was "having accelerating fears, new or at least greatly increased since this episode of head pain, involving claustrophobia, fear with passing over a bridge or a ditch on the road, around curves, and the like." R. 318. She had reduced her driving because of these phobias. Gustin also described "some generalized problems with anxiety[.]" *Id*. The doctor performed a neurology exam that was normal in all respects. She indicated that if Gustin had another episode, an EEG would be reasonable. She also noted the following regarding Gustin's condition:

> Many of her symptoms would be consistent with anxiety and a panic attack, possibly with hyperventilation, although admittedly that isn't a perfect fit either. It's possible that the anxiety is a secondary reaction to the original headache. Still, her level of anxiety and list of phobias are growing rapidly and becoming very dysfunctional for her. I'm not sure whether she would be receptive [to] (or able to afford) directed mental health care, but possibly her primary care provider . . . could gently address this.
>
> Ms. Gustin may indeed have fibromyalgia, but isn't treating it optimally. She has no exercise program, but it is generally accepted now that the most successful treatment of fibromyalgia involves (gentle) physical conditioning. A good physical therapist could probably add a little gait training so

13

>     that Ms. Gustin would feel more secure on her feet. Cost is a
>     major problem with this idea, I'm sure, however.

R. 320.

On October 30, 2008, Gustin saw a doctor with a complaint of chronic right arm pain and a prolonged cough. A right shoulder x-ray was negative, as was a chest x-ray. She was treated with medication. R. 334.

On November 8, 2008, Gustin went to the emergency room complaining of right shoulder pain. She had had a cortisone injection earlier that day which made it more difficult to move her shoulder, and she had awakened in the early morning with nausea and "burning inside." R. 326. Doctors administered Toradol, which significantly improved Gustin's pain. She was directed to follow up with her family doctor.

### *Vocational expert's testimony*

The ALJ asked VE Gale Lenhart to consider a worker almost 50 years old at her onset date, with a high school education and some post-high school vocational training, and Gustin's past work history, which the VE noted had been in the sedentary and light work categories. The ALJ asked the VE to consider that this individual had the following limitations:

>     The first question I had is for light work. If she could
>     occasionally lift or carry 20 pounds frequently, lift or carry 10
>     pounds. Could stand, sit or walk for six hours in an eight hour
>     day. Could occasionally perform postural activities. Climb,
>     balance, stoop, kneel, crouch, crawl. Should not work on
>     ladders, ropes and scaffolds. Should not work with hazards
>     such as dangerous equipment or machinery. Then from an
>     environmental standpoint, should not work with extreme cold
>     or heat or concentrated fumes, odors, dust, gases. Prefer she
>     have a job where she's working indoors. And with that
>     functional capacity, could she go back to any of her past work?

R. 48. The VE responded that the hypothetical individual could perform any of Gustin's past jobs. If the individual could use her hands only frequently, rather than constantly, then the fast food worker would be eliminated.

The ALJ asked the VE to consider sedentary jobs where the individual would not have to stand or walk more than two hours a day. She could sit for six hours a day, with normal breaks, and could use her hands frequently, but not constantly. The VE stated the individual would be able to return to Gustin's past job as a gambling cashier, and could transfer to some other sedentary cashier jobs.

The VE stated that if Gustin's testimony regarding her limitations was considered to be fully credible, then she would be unable to perform any type of work.

Gustin's attorney asked the VE to consider an individual with the limitations described by Dr. Hurley. This individual could can stand for thirty minutes at a time, for a total of two hours a day; sit continuously for two hours at a time, for a total of four hours a day; need to walk around every sixty minutes for about five minutes at a time; use her hands, fingers, and arms for repetitive activities as follows: hands 40% of the time, fingers 30% of the time, and arms 20% of the time; and lift frequently less than ten pounds, occasionally ten to twenty pounds. The VE stated that with those restrictions, the individual would be unable to work at any job on a full-time basis.

*Summary of ALJ's Decision*

The ALJ found Gustin had not engaged in substantial gainful activity since her alleged onset date of May 7, 1995. She found Gustin to have severe impairments including fibromyalgia and COPD with a history of smoking, but further found these impairments, singly or in combination, did not meet the Listing level of severity. She found Gustin's mental condition to be nonsevere.

The ALJ found Gustin to have the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently lift 20 pounds and occasionally lift 10 pounds. She could stand, sit, or walk for six hours in an eight hour day. She can occasionally perform postural activities, including climbing, crouching, stooping, or kneeling. She should not work on ropes, scaffolds, or ladders. The claimant should not work with hazards, such as dangerous equipment or machinery. She should avoid extreme cold, heat, fumes, dust, gases, or working outdoors. The claimant could use her hands on a frequent, but not a constant basis.

R. 12. In reaching this RFC assessment, the ALJ did not give great weight to Dr. Hurley's opinion regarding Gustin's work-related physical abilities. Although the ALJ "recognize[d] that Dr. Hurley is a specialist in the area of rheumatology," she found the other evidence of record and Dr. Hurley's progress notes did not support his conclusion that Gustin was as limited as described on the doctor's assessment.

In particular, the ALJ observed that Gustin's fibromyalgia was noted to be "doing well" even though Gustin had not followed her doctor's recommendation that she engaged in a regular program of exercise. The ALJ further observed that after seeing Dr. Hurley in July 2007, Gustin did not return to see him until January 2009, when she reported that "she was getting along relatively well despite some ongoing pain that did not interfere with walking once or twice a day." R. 14. The ALJ noted Gustin had not seen Dr. Hurley for the year following his medical source statement, nor did he review the other medical reports contained in the record. The ALJ had encouraged Gustin to contact Dr. Hurley again after the ALJ hearing, but according to the ALJ, Gustin failed to do so.

The ALJ gave great weight to the consultative examination performed by Dr. Martin, noting his "conclusions support a finding that the claimant's fibromyalgia is not as severe as she alleges." R. 15. She based her RFC assessment on Dr. Martin's findings. She further relied on the opinions of the state agency consultants who "were impressed that the claimant had no active synovitis at each appointment with Dr. Hurley,

Dr. Hurley's treating source statement was completed at the claimant's lawyer[']s request, and the doctor's admission that predicting the prognosis of the claimant's fibromyalgia could not be done because the condition was too variable." *Id*.

The ALJ noted Gustin had claimed at the hearing that her limitations were so severe, she could not perform even sedentary work on a sustained basis. The ALJ found this inconsistent with Dr. Hurley's June 2009 note that Gustin was doing relatively well. The ALJ observed, "In fact, it appears that the claimant has started exercising which has led to the claimant's fibromyalgia being controlled. The undersigned finds that the effectiveness of following prescribed exercise tends to erode the claimant's credibility that she is completely unable to work and would be 'crippled soon.'" R. 16.

The ALJ further found Gustin's allegations to be "inconsistent with her activities of daily living that included driving, shopping, cleaning, vacuuming, and doing laundry. The claimant alleges that her hands cramp significantly, but this is not supported in the clinical notes and is inconsistent with her admitted ability to use a computer." *Id*. Although the ALJ found Gustin would be unable to perform medium or heavy work, she found Gustin to be "capable of performing her past relevant work as a sales attendant, flea market worker, and night auditor (gambling cashier)," which jobs fall within the RFC as determined by the ALJ. She therefore concluded Gustin is not disabled.

## *Discussion*

Gustin argues, among other things, that the ALJ erred in failing to accord controlling weight to Dr. Hurley's opinions. She points out that Dr. Hurley is her treating rheumatologist, and she asserts the case law and regulations require that his opinions be given controlling weight because they are well supported by the objective evidence of record.

In *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians:

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, *see Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).
>
> Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13. *Accord Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002).

In the present case, the state agency consultant whose opinion received controlling weight agreed with Dr. Hurley's assessment of Gustin's lifting and carrying limitations. The consultant disagreed with Dr. Hurley's opinion that Gustin would be able to work only six hours per day, on the basis that Gustin "drives, shops in stores, cleans, vacuums, and

does the laundry." R. 310. The only evidence of record is contrary to this conclusion. Gustin testified she drives only when necessary, for short distances, and she always takes another driver with her. She purchases a few items at a time at the grocery store, and occasionally visits a thrift store with her mother. She rarely vacuums, and even gathering up a load of laundry makes her tired. She is assisted with all of her household chores and yard work by her son and daughter-in-law, with whom she resides. These daily activities do nothing to contradict Dr. Hurley's assessment. The other medical assessments in the record are *not* "supported by better or more thorough medical evidence." *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997). Rather, the opinion of Gustin's treating physician, who is a specialist in the field of rheumatology, should have been given controlling weight.

The Commissioner argues the ALJ gave valid reasons for discounting Dr. Hurley's opinion. The ALJ found the doctor's notations that Gustin was "getting along relatively well" to be inconsistent with the limitations he imposed on Gustin. She further found the fact that Gustin was "walking once or twice a day" in spite of her ongoing pain, and that she engaged in some routine daily activities, was inconsistent with Gustin's allegations of disabling pain. The court finds otherwise. A claimant's "ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work[.]" *Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009) (citing *Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engaged in substantial gainful activity.") (citation omitted)). In addition, the court finds the fact that Dr. Hurley completed his treating source statement at the request of Gustin's lawyer to be both irrelevant and an improper basis upon which to discount the doctor's opinions. When the VE was presented with a

set of limitations consistent with Dr. Hurley's opinion, the VE testified Gustin would be unable to sustain any gainful employment.

For these reasons, the court finds the record "overwhelmingly supports" an immediate finding of disability. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). Accordingly, the Commissioner's decision is **reversed**, judgment will be entered in favor of Gustin, and this case is remanded for an immediate calculation of benefits.

**IT IS SO ORDERED.**

**DATED** this 28th day of February, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT